Shanon J. Slack, Esq.
Email: slack@slacklawgroup.com
Slack Law Group, APC
2030 Main Street, Suite 1300
Irvine, CA 92614
Tel: (213) 332-3721

Duncan Turner (*Pro Hac Vice*)
E-Mail: dturner@badgleymullins.com
BADGLEY MULLINS TURNER PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
Tel: (206) 340-5907

*Counsel for Dari-Tech, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DIVISION OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| In re:<br><br>GREGORY JOHN TE VELDE,<br><br>Debtor. | Case No. 1:19-cv-00520-KES |
| RANDY SUGARMAN, CHAPTER 11 TRUSTEE,<br><br>Plaintiff,<br>v.<br><br>IRZ CONSULTING, LLC; aka IRZ CONSTRUCTION DIVISION, LLC;<br><br>Defendant.<br><br>AND RELATED THIRD-PARTY COMPLAINT AND CONSOLIDATED ACTIONS. | **THIRD-PARTY DEFENDANT DARI-TECH, INC.'S OBJECTIONS TO BANKRUPTCY COURT'S FINDINGS AND RECOMMENDATIONS AS TO DARI-TECH'S SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>F&R Issued: April 24, 2025<br><br>**ORAL ARGUMENT REQUESTED** |

THIRD-PARTY DEFENDANT DARI-TECH INC.'S OBJECTIONS RE FINDINGS AND RECOMMENDATIONS OF BANKRUPTCY COURT

# I. INTRODUCTION.

Third-Party Defendant Dari-Tech, Inc. ("Dari-Tech") respectfully objects to the Bankruptcy Court's "Findings and Recommendations for De Novo Consideration as to Dari-Tech, Inc.'s Second Motion for Summary Judgment." Bankr. Ct. Dkt # 824, Dist. Ct. Dkt #49 (hereinafter "Findings").

The bases for Dari-Tech's objections are summarized as follows:

- The Bankruptcy Court erred in denying Dari-Tech's submission of a second motion for summary judgment.

- Contrary to Dari-Tech's contract with the Debtor, the Bankruptcy Court has inferred duties of design for the Dairy that were specifically disclaimed in that document. As a matter of law, Dari-Tech did not have these expanded duties.

- The Bankruptcy Court failed to apply the standards of Fed. R. Civ. P. 56 (c)(1) in requiring IRZ to produce admissible evidence to establish genuine issues of material fact as to both liability and causation of any damages.

- The Trustee's twelve claims against IRZ, which IRZ realleged against all Third-Party Defendant are specific. After Dari-Tech filed its first motion for summary judgment, IRZ conceded that Dari-Tech had no role in five of the twelve. Subsequently, IRZ's key employees, including its owner, were deposed. These witnesses testified that Dari-Tech had no role in the remaining seven allegations, and that, in fact, Dari-Tech's design of its equipment was proper and there were no issues with the installation. This should have been sufficient for the Court to grant Dari-Tech's second motion.

## II.   THE COURT SHOULD FOCUS ON THE SPECIFIC ALLEGATIONS AT ISSUE IN THE CASE.

### A.   The Claims of Trustee against IRZ and the hypothetical claims by IRZ against the Third-Party Defendants are focused on specific alleged shortcomings.

For the purposes here, the broad history of the ill-fated Lost Valley Farm is outlined in the Bankruptcy Court's Findings pp. 2-5.  However, the Bankruptcy Court has stated as fact in its "Background" section certain matters that are contrary to the record and undisputed.  For example, on page 2, the Court describes Dari-Tech and the other third-party defendants as "subcontractors," while conceding that some, like Dari-Tech, had direct contracts with the Debtor "according to some of the evidence."  Id. p. 3.  The Court's equivocation on Dari-Tech's status finds no support in the record.  It is undisputed that Dari-Tech had no contractual relationship with IRZ.

The Bankruptcy Court summarized the Debtor's claims against IRZ as follows:

> Trustee's allegations are that IRZ allegedly failed to competently perform management services for the planning, engineering, and construction of the dairy waste collection, treatment, conversion, and disposal system.  The complaint includes four claims for relief:  objection to claim, breach of contract, negligence, and fraudulent transfer.

Id. p. 4.

Here, the Bankruptcy Court paints with too broad a brush, suggesting that because Dari-Tech's BioLynk tank was part of the "dairy waste collection system," it could be somehow responsible for the whole.  However, as pointed out in the Second MSJ Memorandum (Dkt. 756), there are many parts to this system, and Dari-Tech only had responsibility for a discrete part that by all accounts was properly designed and installed.  *Id.* pp. 5-8.

To add focus to the inquiry, the District Court should look at the Debtor (and hence IRZ's) specific allegations.[1]  As summarized and enumerated by the Bankruptcy Court, they are  (1) site planning; (2) a grading plan for mass excavation calculations; (3) an infrastructure plan for drain lines, underground water lines, and power lines; (4) an effluent water flow plan to include lines for drainage, structures, corrals, and effluent handling components to the lagoon system; (5) a lagoon design system; (6) "most egregiously" an irrigation plan that proved insufficient for the herd size; (7) a defective site plan which provided insufficient grade in the dairy stalls and an inadequate flushing system for the waste to flow in the catch basins; (8) specification for use of porous decomposed granite for bedding; (9) specified underground piping of insufficient diameter and flow; (10) specified inadequate impermeable surface areas throughout the system; (11) specified overflow pipes and drains of improper height so that effluent improperly spilled out of the lagoon and the sand lane areas; and (12) failure of construction management.  Dkt 343.

**B.    IRZ's own witnesses absolve Dari-Tech of any liability for the Paragraph 29 allegations.**

Allegations 3, 4, 5, 6, and 12 were dismissed on Dari-Tech's First MSJ after being conceded by IRZ. For all of the remaining allegations (1, 2, 7,-11) any likelihood for evidentiary support for them was eliminated by IRZ's employees' and owner's sworn deposition testimony.  See Dkt. 756 pp. 8 -21. These pages include the specific testimony of IRZ's owner, principal project manager, and on-site manager, as well as IRZ's expert's report.  Not one of them found any fault with Dari-Tech's design of its equipment, the capacity of the equipment, or its installation.  As was the case with Dari-Tech's First MSJ, the project manager, Downey, submitted a declaration that  pointed the finger at the entire list of third-party defendants, with no specific support as to claims against any of them.  This declaration as it might pertain to Dari-Tech, drafted by IRZ's lawyers, of course, is entirely

---

[1] The list of allegations comes from Paragraph 29 of the Debtor's complaint, which were unnumbered.  In Dkt. 343, the Bankruptcy Court conveniently numbered and summarized them, and they are referred to here as the "Paragraph 29" allegations.

inconsistent with his deposition testimony. Furthermore, the Ninth Circuit has consistently recognized that a party cannot avoid summary judgment by creating "an issue of fact by an affidavit contradicting [its] prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). In such circumstances, the Court may strike contradictory, sham affidavits intended to defeat summary judgment. *Id.*[2]

### III. DARI-TECH'S SECOND MOTION FOR SUMMARY JUDGMENT IS NOT "ESSENTIALLY THE SAME" AS ITS FIRST MOTION.

The Bankruptcy Court erred in concluding that in "[i]ts second motion, Dari-Tech argues essentially the same contentions" as were in the First MSJ. Of course, every summary judgment motion is based on the premise that there are undisputed facts that lead to one conclusion. The difference here is that certain claims and many facts that were not, as a practical matter, available in April of 2022, when the First MSJ was filed. In the First MSJ, IRZ was able to convince the Bankruptcy Court that something had gone wrong with the waste management system, and since Dari-Tech supplied a component of that system, there was insufficient clarity in the evidence to conclude that Dari-Tech was not at fault. Now there is, and it comes from IRZ's sworn testimony.

Prior to the First MSJ, IRZ had refused to identify with specificity its claims against Dari-Tech, and in the ensuing briefing and argument, new formulations of the potential claims emerged, including whether the Dairy's staff had been trained, etc. Later, when witnesses, particularly the dairy manager Travis Love, were deposed, the true causes of the Dairy's failure emerged, including the faulty sand lanes and the Debtor's failure or inability to complete the entire waste management system (e.g., the lagoons).

---

[2] Although Downey was deposed in his personal capacity, he described himself as the person at IRZ "most knowledgeable about what happened at the te Velde dairy." Downey Dep. at 276:4-10.

**IV.  THE BANKRUPTCY'S IDENTIFICATION OF "ISSUES OF MATERIAL FACT" FALLS SHORT OF THE SUMMARY JUDGMENT STANDARDS.**

In the Bankruptcy Court's Findings, it dedicates a section to "Some Genuine Issues of Material Fact." Dkt. 824 at 10.  These deserve greater scrutiny under the well-known summary judgment standards, pursuant to which the mere existence of disputed facts will not preclude summary judgment, and only disputes over facts that might affect the outcome of the suit will preclude entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48. (1986).  "If the moving party satisfies his initial burden [of demonstrating the absence of issues of fact], the opposing party may not rely on denials in the pleadings, but must produce specific evidence, through affidavits or admissible evidence, to show that the dispute exists." *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404 (9th Cir.), *cert. denied* 112 S.Ct. 617 (1991).  "***A mere scintilla of evidence will not do***, for the jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978), cert. denying 440 U.S. 981 (1979) (emphasis added; citations omitted).  As is shown in Dari-Tech's Second Memorandum and below, the Bankruptcy Court departed from these rigorous standards in denying summary judgment.

The Court's first premise is that "Wayne Downey of IRZ … discussed with Josh Obendorf that the operation of the manure management system was woefully inadequate," citing to Downey's Declaration p 313.  Here is that testimony:

> Q. And what was the comment about -- the commentary about that? What was the colloquy between the two of you?
>
> A. The general discussions that I had with Josh Obendorf after I left the project and cows were on the project was that the project wasn't completed and that the operation of the manure management system was woefully inadequate.
>
> Q. Did he give you any specifics about what parts were woefully inadequate?
>
> A. The flushing was woefully inadequate due to the lack of water at the dairy.
>
> Q. In other words, they couldn't add enough fresh water to make the system work properly?
>
> A. Correct.
>
> Q. But you've seen the Biolynk tank system working properly on other dairies.
> Did those dairies have a proper water supply?
>
> A. Yes.

Note that Downey is communicating with another IRZ employee and not someone at Dari-Tech. Downey did not state that the BioLynk tank failed within its operating parameters. Rather, he said that the Dairy lacked enough fresh water to make the system work properly. Here, Downey may be wrong, or he may just lack personal knowledge. Either way, it is not material to the motion. The person that did know was Travis Love, the dairy manager. He makes clear a number of things:

- It was the Debtor and not Dari-Tech that was responsible for sourcing water for the dairy. Love Dep. pp 100-105. In this testimony, he related that the Debtor had plans to get water from the City of Boardman or the Port of Morrow. The Debtor also planned to drill three wells, two of which were completed. At times, the Dairy trucked water to the Dairy to meet its needs. In fact, the Debtor drew some water from the Columbia River, and some of its allocated surface water from the Dairy's irrigation ditches. *Id.*

- The Debtor's original water acquisition plan was held up because the state would not grant much access to ground water as a result of protests of its water rights claim. Id. p. 102.

- Even so, Love testified at page 101 of his deposition that at all times the source of water was adequate.

> Q. Okay. Did you ever have a time where you had insufficient water from those sources to operate the dairy to your standards?
> A. No. We had -- I think we averaged eight loads a day hauled by LTI and/or Blue Storage Tank.

In short, this is another instance of the Court ignoring the actual evidence. Downey did not implicate Dari-Tech in the water shortage issue, and had there been a shortage of water, there is no evidence that Dari-Tech had any duty to supply water or to ensure its supply. The only evidence is that the Debtor conducted all of this planning.

The Court's second premise is that "Travis Love … expressed concerns concerning manure management and other aspects of the project." The Court's citations to Love's deposition (*see* Dkt 824 p. 8, fn. 8), as they pertain to Dari-Tech relate that the BioLynk tank filling with sand. The issue of sand making its way to the BioLynk tank is discussed in detail in Dari-Tech's Second Memorandum pp 21-25 and its Reply (Dkt 756) pp. 5-11. The root cause was the inadequate design of the sand removal lanes, which Dari-Tech, by the admission of IRZ's witnesses, had no responsibility for. Dkt 756 at 10. Note as well that the Debtor planned the Dairy and rejected Dari-Tech's original proposal that provided for more separators. Furthermore, the Debtor bought separators from USFarm, not Dari-Tech, and there again it installed half the number proposed by USFarm.

Third, the Bankruptcy Court asserted that there were issues of fact "as to whether there were concerns expressed to IRZ and Dari-Tech about the manure management system." Here, again, the Bankruptcy Court addresses "the manure management system" without considering the limited part supplied by Dari-Tech. Concerning the Dari-Tech equipment, the only evidence in the record is in the form of David DeWaard's declaration, and he testified that Dari-Tech never received complaints or

requests for assistance before the Dairy was shut down. There is no "conflicting testimony," Dkt. 824 at 10, about complaints to Dari-Tech to which the Bankruptcy Court alludes. The Court's citation to the record is the email between Downey and ***IRZ employee*** Josh Obendorf, related to the Dairy's lack of water. This is discussed *supra*, p. 6.[3]

Fourth, the Bankruptcy Court claims that there are issues of fact as to the "[e]xtent of Dari-Tech's design of the manure system." Dkt 824 at 11. The Court's first reference to support this is Downey's Deposition, pp. 106:11-18, which the Court summarizes as discussions between Dari-Tech and the Debtor "changing portions of Dari-Tech's design of certain components of the manure system." Dkt 824 at 11. The cited reference does not deal with Dari-Tech at all, as shown here:

```
11    Q    Let me show you next what I've marked as
12  Exhibit 128.
13        (Exhibit No. 128 marked.)
14  BY MR. VOTE: (Continuing)
15    Q    This is the CAFO permit, which was also dated
16  March 31, 2017. Did you review Exhibit 128 when it was
17  issued?
18    A    I'm quite certain that I looked at this, but I
19  wouldn't call it a "review" because there's nothing in
20  this that pertains to construction.
```

Downey's Dep., pp. 106:11-18. This refers exclusively to Downey's review of the Debtor's application for a confined animal feeding operation (CAFO) permit, of which Dari-Tech had no part.

Fifth, the Court says there is conflicting reports as to whether Dari-Tech was involved in the design of "reception pits sizes which may or may not have been rejected by the Debtor." The Court's citation here is to the O'Donnell Declaration, Dkt 794, and Downey's Declaration at 104-1-22, 106:11-18, and 108:4-9. O'Donnell's declaration says nothing about "reception pits."[4] He says he has seen communication by Dari-Tech "providing its opinion on sand lane sloping and pump depths for

---

[3] Here, the Bankruptcy Court appears to have confused the IRZ employee Josh Obendorf with a Dari-Tech employee, Josh McCort. McCort was not a part of this email conversation.

[4] See Dari-Tech's Reply, Dkt 803 at 11. When asked if Dari-Tech designed collection pits, Downey testified, "Daritech [sic] did not."

the project." Dkt 794 ¶ 8. He does not identify these communications, but the only ones in the record are covered in Dari-Tech's Reply Dkt 803, pp. 9-10. As to the sand lane sloping, Dari-Tech sent an email to IRZ asking what IRZ's (or the Debtor's) design was for the slope of a part of the sand lane, but it never got a reply. Dari-Tech offered no input to this design factor. As to Downey's reference to "pump depths," see again Dari-Tech's Reply Dkt 803 pp. 9-10. There was no input about the depth of pumps themselves. The issue was the depth of a "drywell," which is a vertical access route (by stairs or ladder) that a person servicing the pumps would use. There is no evidence in the record that the drywell had any effect on the flow of waste in the dairy (lack of causational evidence), so there is no substance to deny summary judgment based on these undisputed facts.

Sixth, the Bankruptcy Court attempts to manufacture an issue based around the premise that "Dari-Tech continued with the project using its other components even though critical parts of its role in the system were supplied by parties other than Dari-Tech." The Court goes on to say that "[t]his presents a material issue of Dari-Tech's knowledge that the Debtor was intending to use components that Dari-Tech did not design or supply." Dkt 824 at 11-12. There are several flaws in the Court's reasoning to arrive at the conclusion that this raises an issue of fact. (1) Dari-Tech's contract with the Debtor excluded any duty to design anything other than the components it was to supply. *See* Reply, Dkt. 803, p. 8. (2) There is no evidence in the record that the equipment provided by USFarm was incompatible with that of Dari-Tech. The only reference in that regard is that the Debtor only installed two of the four manure separators that USFarm recommended. There is no evidence in the record that Dari-Tech had reason to believe that the sand lanes or USFarm's separators would fail. (3) IRZ's expert, O'Donnell, opined in his report that "the Biolynk system appeared to be properly designed." Reply, Dkt 803 at 20. So, the Court's analysis here has no basis in fact and is contrary to the undisputed facts in the record.

Seventh, the Bankruptcy Court finds an issue of fact as to whether the BioLynk tank "was to evacuate solids, including sand." Dkt 824 at 12. Here, the Court overlooks what the actual testimony

was. Sand lanes are designed to remove the vast majority of the sand bedding. As Travis Love testified, it is like panning for gold where the heavy solids remain behind. Love Dep. 108-109. The problem was, as Love explained, "the sand lanes were a terrible engineering mess." Dkt. 756, p. 22-23. Travis Love was aware that there were specific separators for sand that a dairy operator could, at its election, install. He had experience with them at a previous dairy and operated without them when the machinery wore out. Love Dep. p. 111:10-22. The Bankruptcy Court's analysis here hinges on a presumption that is not supported in the factual record: that the BioLynk tank should have removed *all* of the sand.[5] To the contrary, Travis Love testified under USFarm's questioning that after the effluent is treated in the sand lanes and before the USFarm separators - *one step ahead of the BioLynk tank* - minimal sand should be remaining in the effluent.

> Q. Rather than putting words in your mouth, let me just have you describe what those vibrating screen separators are supposed to separate out of the waste stream that you directed it off of?
>
> A. When the water comes over the top of the screen and slides down, the vibrators shake to keep the solids sliding down the screen; otherwise, the solids build up on the screen and then it plugs the screen so you get a massive flow of just wastewater coming down with all the sand and debris and whatever else is in it.
>
> Q. And the solids, in particular that these screens are supposed to separate out, they're feedstock solids, right?
>
> A. Yes.

---

[5] As Dari-Tech points out in its Reply, Dkt 756, it is not an accurate description to say that the BioLynk tank "failed." The tank has a valve at the bottom to discharge solids to the lagoons. As Love pointed out, very little of this should be sand. An apt analogy would be to compare this to a bathtub drain. If a person returns from the beach and washes sand from their feet, it is expected that the drain would handle the small amount of sand. If, instead, the person dumped a five-gallon bucket of sand and water into the tub, one would expect the sand to clog the drain and prevent anything from evacuating from the tub.

> Q. So bits of undigested hay or whatever else the --
> A. Straw, hay, whatever, yes.
> Q. Not, for example, sand. That is not what these separators separate?
> A. No. Sand plugs them.
> Q. And so if everything was working well with the system at the Lost Valley Dairy, there would be no or minimal sand in that waste stream by the time it reached U.S. Farms separators, does that sound right to you?
> A. Yes.
> Q. In your experience working with the separators -- the U.S. Farm's separators -- at Lost Valley Dairy, did they work well?
> A. They worked well if the sand lanes were working properly. If I had too much flow of water, I flooded the separators out.

Love Dep. 119-120.

So, while the Bankruptcy Court would find an issue of fact in the extent to which the BioLynk tank should have the capacity to remove sand, the evidence in the record is that the expected capacity is minimal. There is no issue of fact on this. The evidence is also undisputed that the sand lanes were not working properly and that the Dairy operator by-passed the separators and poured massive quantities of sand into the BioLynk tank, which was the cause of it clogging.

**V.   THE SECOND MOTION SHOULD NOT BE DENIED AS BEING REPETITIVE.**

The Bankruptcy Court's recommendation that the Second Motion be denied as being repetitive of the first one and should be rejected. When the first motion was drafted, the written discovery from IRZ seemed to confirm that it had no evidence that Dari-Tech had any role in almost all of the twelve Paragraph 29 allegations. At the time, the failure of the sand lanes had not been revealed, and this is the underlying cause for the manure management system's breakdown. Also not known was the

extent to which the Bankruptcy Court would go outside the record to raise questions that, in fact, are not material to the outcome of the case.

As the Court notes, one basis for allowing a second motion is "an expanded factual record." Dkt 824 at 7. The Court describes this case as a "saga now spanning over six years, three presidential administrations, and a pandemic." *Id*. at 4. Over this time period, the parties to the case (principally the Trustee and IRZ) have conducted numerous discovery motions and amended pleadings. Their dispute has controlled the ability of the parties to develop a coordinated deposition plan, which finally occurred in May of 2024. Dkt 747 (Stipulation to Amend Discovery Plan). Until that time, the ability of a third-party to conduct independent depositions was not practicable.

Overall, however, courts should be guided by the principles of Fed. R. Civ. P. 1 as expressed in Dari-Tech's Reply Dkt 803 at 3. Where a party such as Dari-Tech has a reasonable expectation of prevailing on summary judgment (in whole or in part), and where the comparative expense to it and the court of a trial on the merits weighs in favor of allowing the motion, the Rule 1 objectives are met by allowing the motion to proceed. Such is the case here.

## VI. BANKRUPTCY COURT DOCUMENTS RELATED TO THE MOTION.

The documents related to the Second Motion for Summary Judgment are as follows:

- Notice of Hearing, Dkt 755.
- Dari-Tech's Second Motion for Summary Judgment, Dkt 755.
- Dari-Tech's Memorandum of Points and Authorities in Support of its Second Motion for Summary Judgment, Dkt 756.
- Dari-Tech's Statement of Undisputed Facts, Dkt. 757.
- Declaration of Duncan C. Turner, Dkt 758.
- Exhibits in Support of Dari-Tech's Second Motion for Summary Judgment, Dkt 759.

- Third-Party Plaintiff IRZ Consulting's Opposition to Dari-Tech's Second Motion for Summary Judgment, Dkt 788.
- Third-Party Plaintiff IRZ Consulting's Response to Dari-Tech's Statement of Undisputed Facts, Dkt 789.
- Declaration of Wayne Downey, Dkt 790.
- Third-Party Plaintiff IRZ Consulting's Evidentiary Objections in Opposition to Dari-Tech's Second Motion for Summary Judgment, Dkt 791.
- Declaration of Benjamin P. Tarczy, Dkt 792.
- Exhibits in Support of Third-Party Plaintiff IRZ Consulting's Opposition, Dkt 793.
- Declaration of John G. O'Donnell, P.E., Dkt 794.
- Dari-Tech, Inc.'s Reply in Support of its Second Motion for Summary Judgment, Dkt 803.
- Dari-Tech, Inc.'s Response to Third-Party Plaintiff IRZ Consulting's Evidentiary Objections, Dkt 804.
- Praecipe to Attach Document, Dkt. 806.
- Finds of Fact and Conclusions of Law, Dkt. 824.
- Rulings on Third-Party Plaintiff IRZ's Evidentiary Objections in Opposition to Dari-Tech's Second Motion for Summary Judgment, Dkt 826.

## VII.   CONCLUSION.

While Dari-Tech appreciates that this case involves many facts, some relevant and some not, pertaining to an industry that the Bankruptcy Court may know little about, consideration of Dari-Tech's Second Motion deserved a more pointed and precise analysis as to what allegations were supported by admissible evidence versus those that had no basis. It bears repeating that the Paragraph 29 allegations are the substance of the case. The "issues" of training and supervision or of design

beyond the scope of Dari-Tech's work have been manufactured by the Bankruptcy Court. They form no part of the Trustee's claims against IRZ and are nowhere to be found in IRZ's Third-Party Complaint. Even so, Dari-Tech has shown by unrefuted evidence that its role was defined, that it met its obligations to the Debtor, and that the failure of the Dairy lies elsewhere, as a matter of law.

Dated: May 8, 2025.

**BADGLEY MULLINS TURNER PLLC**

By: */s/ Duncan C. Turner*_____
Duncan Turner (*Pro Hac Vice*)
E: dturner@badgleymullins.com

*Counsel for Dari-Tech, Inc.*

**SLACK LAW GROUP APC**

By: */s/ Shanon J. Slack*_____
Shanon J. Slack
Email: slack@slacklawgroup.com

*Liaison Counsel for Dari-Tech, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of May, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

          *s/ Yonten Dorjee*
          Yonten Dorjee, Paralegal
          **BADGLEY MULLINS TURNER PLLC**
          Email: ydorjee@badgleymullins.com